IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM STAPE,            :

     Plaintiff          :

    v.                 :     CIVIL NO. 3:13-CV-02308

CAROLYN W. COLVIN, ACTING  :    (Judge Brann)
COMMISSIONER OF SOCIAL     :
SECURITY,              :

     Defendant      :

## **MEMORANDUM**

## **Introduction**

Plaintiff William Stape has filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Stape's claim for social security disability insurance benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." Stape met the insured status requirements of the Social Security Act through June 30, 2015. Tr. 125.[1]

---

[1] References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Answer on February 7, 2013.

Stape protectively filed[2] his application for disability insurance benefits on August 26, 2010. Tr. 12.  Stape claims that he became disabled on July 31, 2010. Tr. 12, 117.  Stape has been diagnosed with a seizure disorder as well as mood and anxiety disorders.  Tr. 240, 252-53.  Stape has complained of gout to at least two doctors.  Tr. 188, 301-02.  Stape's application was initially denied by the Bureau of Disability Determination.

On January 6, 2011, Stape requested a hearing before an administrative law judge ("ALJ"). Tr. 12.  The ALJ conducted a hearing on December 15, 2011, where Stape was represented by counsel. Tr. 28-53.   On January 6, 2012, the ALJ issued a decision denying Stape's application. Tr. 12-20.  The Appeals Council delined to grant review on July 2, 2013.  Tr. 1.  Stape filed a complaint on September 4, 2013.   Supporting and opposing briefs were submitted and this case became ripe for disposition on January 8, 2014, when Stape filed a reply brief.

Stape appeals the ALJ's determination on three grounds; (1) the ALJ erred in failing to evaluate Stape's gout, (2) the ALJ erred in failing to give appropriate weight to the medical opinion of Stape's treating physician, and (3) the ALJ erred in

---

[2]Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

failing to find Stape credible.  For the reasons set forth below, the decision of the Commissioner is affirmed.

**Statement of Relevant Facts**

Stape is 52 years of age, has obtained a GED and is able to read, write, speak and understand the English language. Tr. 31.  Stape also had four years of apprenticeship training with the Local 520 Plumbers and Pipefitters.  Id.

Stape spent approximately thirty-one years as a pipe fitter, which was described by a vocational expert as skilled, heavy work.  Tr. 48.  Stape had been promoted several times, and eventually performed supervisory work, which classified him as a "supervisor of labor gang," described as skilled, medium work.  Id.

Stape initially claimed that three conditions limited his ability to work: seizures, stress, and depression.  Tr. 165.  In his request for an administrative hearing, Stape alleged his disability related to seizures, balance issues, focus issues, and memory issues.  Tr. 87.

### A.    Physical Impairments

Stape's medical record begins on October 11, 2007 when Stape was accepted as a new patient by William Phelan, M.D.  Tr. 188.  At his initial intake, Mr. Stape complained of, inter alia, gout.  Id.  At a second appointment with Dr. Phelan on January 7, 2008, Stape again mentioned that one of the reasons for the

3

appointment was gout.  Id.  The medical records contain no objective medical findings for a diagnosis of gout.

The administrative record establishes that, in the year prior to filing for disability benefits, Stape suffered from at least three seizures; the first seizure occurred on September 8, 2009, the second seizure occurred on January 8, 2010, and the final seizure occurred on August 7, 2010. Tr. 134, 180-84, 192-208.

No records exist of a hospital visit after Stape suffered his first seizure. However, after Stape's second seizure, he was admitted to the Carlisle Regional Medical Center emergency room.  Tr. 180.  A physical examination was essentially normal.  Tr. 180-84.  Stape had a follow-up examination with Dr. Phelan on January 14, 2010.  Tr. 187.  Dr. Phelan subsequently referred Stape to Mohammad Ismail, M.D. of the Carlisle Regional Medical Center.  Id.

On January 19, 2010, Dr. Ismail conducted a physical examination and ordered an MRI, neither of which revealed significant abnormalities. Tr. 232-33.  On January 25, 2010, an EEG was performed on Stape, which showed no noticeable abnormalities; however, Dr. Ismail did not rule out seizure disorder.  Tr. 235.

On August 4, 2010, Stape became a new patient of Alexander Spasic, M.D. Tr. 224.  His initial physical examination revealed no abnormalities.  Tr. 224-25.  Dr. Spasic subsequently became Stape's treating physician.

Following an August 7, 2010 seizure, Stape was treated at the Yale-New Haven Hospital in Connecticut.  Tr. 192.  Neither a physical examination nor a CT scan revealed any significant abnormalities.  Tr. 192-93.

On August 18, 2010, Dr. Ismail performed a follow-up examination of Stape.  Tr. 239.  Dr. Ismail diagnosed Stape with a seizure disorder.  Tr. 240.

On September 29, 2010, Dr. Spasic completed a Medical Source Statement of Stape's ability to perform work-related physical activities.  Tr. 215.  Dr. Spasic stated that Stape had no limitations with respect to his lifting or carrying, pushing or pulling, or sitting abilities.  Tr. 215.  Dr. Spasic also opined that Stape was limited in standing or walking to one hour or less in an eight hour day, and that Stape was able to bend, kneel, stoop, and crouch frequently, although he should never climb or balance.  Tr. 215-16.  Dr. Spasic also stated that Stape should not be exposed to heights or temperature extremes.  Tr. 216.

On October 1, 2010. Dr. Ismail also completed a Medical Source Statement detailing Stape's physical and mental limitations for work-related activities. Tr. 230. Regarding Stape's physical abilities, Dr. Ismail opined that Stape had no limitations on his lifting, carrying, standing, walking, sitting, pushing, pulling, or postural functions, and that Stape had no environmental restrictions due to his impairments.  Tr. 230-31.

On October 28, 2010, Jerry Brenner, D.O., a state agency medical consultant, reviewed Stape's medical files and completed a Residual Functional Capacity Assessment. Tr. 241-47. Upon reviewing the files, Dr. Brenner concluded that Stape was capable of occasionally lifting 100 pounds or more, could frequently lift 50 pounds or more, and would stand, walk, or sit for about six hours out of an eight hour workday. Tr. 242. Dr. Brenner concluded that Stape was not limited in his ability to push or pull, had no communicative limitations, no visual limitations, and no manipulative limitations. Tr. 243-44. Dr. Brenner did find that Stape was limited to occasionally using ramps and stair, but that Stape should never climb ladders, ropes, or scaffolds, and that he should avoid even moderate exposure to heights. Tr. 244.

Between November of 2010 and December of 2011, Stape visited Dr. Spasic at least five separate times. Tr. 287, 292, 295, 301, 304. During Stape's February 11, 2011 appointment with Dr. Spasic, a nurse comment was inserted into Stape's file that stated "GOUT IN FOOT/PAPER WORK TO GET DRIVER LISENCE (sic)." Tr. 301, 302. Dr. Spasic also noted at this appointment that Stape walked "with a normal gait." Tr. 303.

### B.    Mental Impairments

In addition to his physical impairments, Stape was diagnosed with two

mental impairments, mood disorder and anxiety disorder.  Tr. 251, 253, 264, 266.

Dr. Spasic, in his September 29, 2010 Medical Source Statement, detailed his opinions of Stape's ability to perform work-related mental activities. Tr. 217.  Dr. Spasic stated that Stape had extreme limitations in his ability to (1) understand, remember, and carry out both simple and detailed instructions, and (2) to make judgments on simple work-related decisions.  Tr. 218.  Dr. Spasic included no medical or clinical findings to support this opinion.  Id.

Dr. Spasic also believed that Stape suffered from slight limitations in his ability to interact appropriately with the public, with supervisors, or with co-workers.  Id.  Finally, Dr. Spasic stated that Stape had moderate limitations in his ability to respond appropriately to work pressures in a usual work setting, and to respond appropriately to changes in a routine work setting.  Id.  Dr. Spasic likewise provided no medical or clinical findings to support this assessment.  Id.

On November 30, 2010, Stanley E. Schneider, Ed.D., performed a consultative psychological evaluation of Stape.  Tr. 249.  Stape reported that he had never been hospitalized psychiatrically, and that he was not receiving outpatient mental health treatment.  Tr. 250.  Stape reported anxiety and depression, difficulty focusing, "jittery and jumpy" feelings, a sense of loss and uselessness, and a feeling of powerlessness regarding his physical status.  Id.  Dr.

Schneider also noted that Stape's mood was dysphoric.  Tr. 251.  The examination

led Dr. Schneider to conclude that Stape suffered from mood disorder secondary

to his seizure disorder, and "significant anxiety."  <u>Id</u>.

Dr. Schneider opined that Stape had no limitations with his ability to

(1) carry out short, simple instructions, (2) make judgments on simple decisions,

and (3) interact appropriately with supervisors and co-workers.  Tr. 255.  Dr.

Schneider did believe that Stape was slightly limited in his ability to interact

appropriately with the public.  Tr. 255.  Dr. Schneider further opined that Stape

was moderately limited in his ability to understand and remember short, simple

instructions, as well as in his ability to carry out detailed instructions.  <u>Id</u>.  Dr.

Schneider also believed that Stape was markedly limited in his ability to

understand and remember detailed instructions.  <u>Id</u>.  Finally, Dr. Schneider

concluded that Stape was extremely limited in his ability to respond appropriately

to work pressures in a usual work setting.  <u>Id</u>.

On December 16, 2010, Alex Siegel, Ph.D., a state agency

psychologist, performed a review of Stape's medical records.  Tr. 257.  Dr. Siegel

concluded that Stape was moderately limited in his ability to (1) understand and

remember detailed instructions, (2) carry out detailed instructions, and (3) respond

appropriately to changes in the work setting.  Tr. 257-58.  Otherwise, Dr. Seigel

concluded that Stape was not limited in any other functional area.  Id.

  Dr. Siegel also opined that, despite evidence of significant short term memory impairment, Stape was able to carry out very short and simple instructions, that Stape could functions in a production oriented job requiring little independent decision making, and that Stape retained the ability to perform repetitive work activities without constant supervision.  Tr. 259.  Dr. Siegel also believed that Stape had no restrictions in his ability to interact with others socially. Id.  Dr. Siegel concluded that Stape was "able to meet the basic mental demand of competitive work on a sustained basis . . ."  Id.

### C. The Administrative Hearing

  On December 15, 2011, Mr. Stape's administrative hearing was conducted.  Tr. 12.  At that hearing, considerable testimony was put forth regarding Stape's medical condition, including lengthy testimony as to Stape's gout and related symptoms.  Tr. 31-47.  Following Stape's testimony, the ALJ elicited testimony from a qualified vocational expert.  Tr. 47-53.

  The ALJ asked the vocational expert to assume a hypothetical individual with Stape's age, education, and work experience who was limited to

light work[3] that required no more than one hour of standing and walking in an

eight hour work day and allowed for a sit/stand option.  The hypothetical was also

limited to no more than frequent bending, crouching, kneeling, and stooping: no

climbing of ladders or balancing: no concentrated exposure to

temperature extremes or heights: and work that involved only simple, routine,

repetitive tasks in a work environment free from fast-paced production involving

only simple work-related decisions, few, if any, work place changes, no

interaction with the public, and only occasional interaction with coworkers.  Tr.

49-50.

   When asked whether this hypothetical individual would be able to

return to Stape's previous work, the vocational expert testified that the individual

would not be able to do so.  Tr. 50.  The vocational expert testified, however, that

this individual would be capable of performing three other jobs that exist in

significant numbers in the national economy: conveyor line bakery worker, bench

---

[3] Light Work is defined by the regulations of the Social Security Administration
as work "with frequent lifting or carrying of objects weighing up to 10 pounds.  Even
though the weight lifted may be very little, a job is in this category when it requires a
good deal of walking or standing, or when it involves sitting most of the time with
some pushing and pulling of arm or leg controls.  To be considered capable of
performing a full or wide range of light work, you must have the ability to do
substantially all of these activities. If someone can do light work, we determine that he
or she can also do sedentary work, unless there are additional limiting factors such as
loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967.

electronics accessory assembler, and an inspector / hand packager. Tr. 50-51.

Upon examination by Stape's attorney, the vocational expert testified that, if the person in that hypothetical suffered from a marked or extreme limitation in responding appropriately to work pressures in a usual work setting, the individual would be unable to perform any jobs in a competitive environment. Tr. 51-52.  The vocational expert also testified that if the individual would regularly miss two or more days of work due to gout outbreaks, the individual would be unable to sustain work activity.  Tr. 52.

**Discussion**

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  In an adequately developed factual

record substantial evidence may be "something less than the weight of the

evidence, and the possibility of drawing two inconsistent conclusions from the

evidence does not prevent an administrative agency's finding from being

supported by substantial evidence." Consolo v. Federal Maritime Commission,

383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other

evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and

"must take into account whatever in the record fairly detracts from its weight."

Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of

evidence is not substantial evidence if the Commissioner ignores countervailing

evidence or fails to resolve a conflict created by the evidence.  Mason v. Shalala,

994 F.2d 1058, 1064 (3d Cir. 1993).  The Commissioner must indicate which

evidence was accepted, which evidence was rejected, and the reasons for rejecting

certain evidence.  Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir.

2008).  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir.

1981).

The Commissioner utilizes a five-step process in evaluating disability

insurance benefits claims.  See 20 C.F.R. § 404.1520; Poulos v. Commissioner of

Social Security, 474 F.3d 88, 91-92 (3d Cir. 2007).  This process requires the

Commissioner to consider, in sequence, whether a claimant (1) is engaging in

substantial gainful activity, (2) has an impairment that is severe or a combination

of impairments that is severe, (3) has an impairment or combination of

impairments that meets or equals the requirements of a listed impairment, (4) has

the residual functional capacity to return to his or her past work and (5) if not,

whether he or she can perform other work in the national economy. See 20 C.F.R.

§ 404.1520.   The initial burden to prove disability and inability to engage in past

relevant work rests on the claimant; if the claimant meets this burden, the burden

then shifts to the Commissioner to show that a job or jobs exist in the national

economy that a person with the claimant's abilities, age, education, and work

experience can perform.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).

### A.    Step One

The ALJ at step one of the sequential evaluation process found that

Stape had not engaged in substantial gainful work activity since July 31, 2010. Tr.

14.  No error is alleged here.

### B.    Step Two

At step two of the sequential evaluation process, the ALJ found that

Stape suffered from three severe impairments: seizure disorder, mood disorder,

13

and anxiety disorder.  Tr. 14.  Stape contends that the ALJ erred in failing to

determine whether gout was a severe impairment.  There was no error in failing to

consider gout at step two.

       The Social Security regulations contemplate the administrative law

judge considering whether there are any medically determinable impairments at

step two and then, when setting a claimant's residual functional capacity,

considering the symptoms of both medically determinable severe and non-severe

impairments. 20 C.F.R. § 404.1529.  The determination of whether a claimant has

any severe impairments, at step two of the sequential evaluation process, is a

threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or

combination of impairments which significantly limit the claimant's physical or

mental abilities to perform basic work activities, the claimant is "not disabled" and

the evaluation process ends at step two. Id.

       If a claimant has any severe impairments, the evaluation process

continues.  20 C.F.R. § 404.1520(d)-(g).  A failure to find a medical condition

severe at step two will not render a decision defective if some other medical

condition was found severe at step two.  See, Rutherford v. Barnhart, 399 F.3d

546, 553 (3d Cir. 2005).  However, all of the medically determinable impairments

both severe and non-severe must be considered at step two and then at step four

when setting the residual functional capacity. The social security regulations mandate such consideration and this court has repeatedly so indicated. See, e.g., Shannon v. Astrue, Civil No. 11-289, slip op. at 39-41 (M.D.Pa. April 11, 2012)(Rambo, J.); Bell v. Colvin, Civil No. 12-634, slip op. at 23-24 (M.D.Pa. Dec. 23, 2013)(Nealon, J.); 20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

The failure of the ALJ to consider gout at step two was not error, since gout does not appear, at least on the evidence presented, to be a medically determinable impairment.  Medically determinable impairments must be established by medical signs and laboratory findings.  See, Salles v. Comm'r of Soc. Sec., 229 Fed. Appx. 140, 144-45 (3d. Cir. 2007), quoting SSR 96-4p.

The record presents no objective medical evidence, such as blood tests revealing a high uric acid level, supporting Stape's assertion that he suffered from gout.  Two alleged diagnoses of gout by Dr. Phelan, both performed years prior to Stape's date of disability, appear to be based on Stape's personal statements regarding his condition.  Tr. 188.  No abnormalities were found at those examinations, and the blood work apparently performed on October 11, 2007 is not contained within the records.  Id.

The February 11, 2011 notes from Dr. Spasic also mention gout.  Tr. 301-02.  However, the language of this note indicates that, at best, it was the nurse who observed the alleged gout and that, more likely, this was Stape's self-reported reason for the visit to the doctor.  Id.  In any event, there is no objective medical evidence indicating an actual diagnosis of gout.  Again, there are no blood tests indicating an elevated uric acid level nor any other medical or clinical findings supporting a diagnosis of gout.  There were also no notes of swelling or redness associated with gout.  To the contrary, Dr. Spasic's notes indicate that Stape was "walk[ing] with a normal gait."  Tr. 303.

Absent any objective medical evidence, gout cannot be considered a medically determinable impairment, and the ALJ's failure to consider gout at step two does not constitute reversible error.

### C.     Step Three

At step three, the ALJ concluded that Stape did not suffer from an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.  Tr. 14.  Stape does not allege error with this finding.

**D.    Step Four**

At step four of sequential evaluation process, the ALJ found that Stape maintained the Residual Functional Capacity to perform light work.  Tr. 16.  The ALJ found that Stape was limited in performing light work inasmuch as Stape required standing and walking for one hour in an eight hour workday, and further required a sit/stand option at work.  Id.  The ALJ found that Stape could frequently bend, crouch, kneel, and stoop, but should avoid climbing ladders or balancing, and should avoid concentrated temperatures and heights.  Id.  Finally, the ALJ found that Stape retained the mental capacity for "simple routine repetitive tasks in a work environment free from fast paced production involving only simple work related decision with few, if any, work place changes, no interaction with the public, and occasionally interaction with coworkers."  Id.  At step four, the ALJ posed a hypothetical question to the vocational expert that accurately depicted all of these limitations.  Tr. 49-50.  Based on this hypothetical question, the vocational expert testified that such an individual would be unable to return to Stape's previous work.  Tr. 50.

In arriving at this Residual Functional Capactiy, the ALJ rejected in part the assessment of Stape's treating physician, Dr. Spasic, wherein Dr. Spasic

17

stated Stape had extreme limitations in carrying out simple and detailed

instructions, as well as extreme limitations in making judgments on simple work-

related decisions.  Tr. 18.  Stape contends that the ALJ erred in rejecting the

opinion of his treating physician.

> i.      Rejection of the Treating Physician's Opinion

The preference for the treating physician's opinion has been recognized

by the United States Court of Appeals for the Third Circuit and by all of the

federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).

When the treating physician's opinion conflicts with a non-treating, non-

examining physician's opinion, the administrative law judge may choose whom to

credit in his or her analysis, but "cannot reject evidence for no reason or for the

wrong reason." Id.  In choosing to reject the evaluation of a treating physician, an

administrative law judge may not make speculative inferences from medical

reports and may reject treating physician's opinions outright only on the basis of

contradictory medical evidence. Id.  An administrative law judge may not reject a

written medical opinion of a treating physician based on his or her own credibility

judgments, speculation or lay opinion. Id.  A treating physician's opinion must be

given controlling weight where that opinion is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent

with other substantial evidence in [the] case record." 20 CFR § 404.1527 (d)(2).

Here, the ALJ concluded that a portion of Dr. Spasic's assessment, that portion relating to Stape's physical limitations, should be given "significant weight." Tr. 18. The ALJ accepted these findings after concluding that the findings were supported by the examination findings and limited treatment history. Id. However, the ALJ concluded that the portion of Dr. Spasic's assessment addressing Stape's mental limitations should be accorded "little weight." Id. In affording little weight to Dr. Spasic's assessment of Stape's mental limitations, the ALJ noted that the findings were not supported by clinical evidence and appeared to be based "more on the claimant's allegations rather than actual findings." Id. The ALJ further accorded little weight to the November 2010 consultative examination where the claimant was assessed as having extreme limitations in responding to pressures in a usual work setting and moderate to marked limitations in understanding and remembering detailed instructions. Id. The ALJ again rejected this opinion because it was not supported by clinical evidence and appeared to be based on the claimant's allegations. Id. The ALJ additionally noted that the limitations were "inconsistent with an individual who has not sought regular ongoing treatment and has not required hospitalization." Id.

The ALJ gave significant weight to the December 2010 psychological consultant opinion that only moderate limitations in Stape's ability to (1) understand and remember detailed instructions, (2) carry out detailed instructions, and (3) respond appropriately to changes in the work setting. Id., Tr. 257-58. The consultant concluded that Stape was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairments." Tr. 259. The ALJ found this opinion to be "well supported by the clinical evidence contained in the record as well as the claimant's activities of daily living." Tr. 18.

Having found that the opinion of Stape's treating physician was not supported by clinical evidence, the ALJ was not obligated to give such opinion controlling weight. Furthermore, despite the Third Circuit's express preference for the opinion of a treating physician, the ALJ was entitled to reject that opinion if a consultant proffered a contradicting opinion, even if the consultant neither treated nor examined the claimant. Morales, 225 F.3d at 317. Having been presented with differing evidence, some pointing to extreme mental limitations preventing competitive work on a sustained basis, and some indicating that Stape would be able to meet the demands of competitive work on a sustained basis, the ALJ was required to credit some evidence over other evidence. The ALJ credited

the evidence presented by the psychological consultant, and this decision was

supported by substantial evidence.  See, Chandler v. Comm'r of Soc. Sec., 667

F.3d 356, 362 (3d Cir. 2011) (holding that, where the ALJ properly considered the

opinion of the state agency physician, the ALJ's decision was supported by

substantial evidence).  Consequently, the ALJ's refusal to give significant weight

to Dr. Spasic's opinion was not reversible error.

<div align="center">

ii.      Discounting Stape's Credibility

</div>

Stape further contends that the ALJ committed reversible error in

discounting Stape's statements regarding his symptoms of gout, such as pain,

intensity, persistence, and limiting effects.

"Allegations of pain and other subjective symptoms must be supported

by objective medical evidence." Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir.

1999), citing 20 C.F.R. § 404.1529.  Where an ALJ does make findings of

credibility, those findings are accorded great weight and deference by a reviewing

court. See, e.g., Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir.

1997).

Here, Stape's allegations of pain and other symptoms relating to his

alleged gout were not supported by objective medical evidence.  No doctor ever

clearly diagnosed Stape with gout, and no objective medical evidence verified the


existence of gout.  The ALJ did consider Stape's testimony regarding gout and its limiting effects, including Stape's allegation that severe gout outbreaks force him to be off his feet for up to two weeks.  Tr. 16.  The ALJ concluded that Stape's statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment."  Tr. 16-17.  The ALJ noted in his opinion that Stape walked with a normal gait at all of his medical appointments.  Tr. 17. The ALJ further noted that, despite Stape's alleged symptoms, Stape ran errands, helped out around the house, tended to his personal care, cooked, cleaned, shopped, did laundry, and took out the trash on his own.

The ALJ properly considered Stape's uncorroborated allegations of symptoms, and found that Stape was not fully credible.  Tr. 16-18.  This finding is entitled to great weight, particularly where there is no medical opinion or objective medical evidence contradicting such a finding.  See, Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002) ("Importantly, [the claimant] does not point to any relevant medical opinion that supports his allegations that his pain and exertional limitations are more severe than the ALJ found them to be.").  Consequently, substantial evidence supported the ALJ's finding that Stape was not entirely credible.  The remainder of the ALJ's determination regarding Stape's residual

functional capacity is not contested, and in any event is supported by substantial evidence.

### E.    Step Five

At step five, the ALJ concluded that, given Stape's residual functional capacity, he was capable of performing three jobs that exist in significant numbers in the national economy.  Tr. 19.  In making this determination, the ALJ posed a hypothetical question that accurately reflected Stape's residual functional capacity to a vocational expert.  Tr. 49-50.  The vocational expert testified that under the circumstances presented in the hypothetical question, the individual would be able to perform three jobs that exist in significant numbers in the national economy.  Tr. 50-51.  As the hypothetical question posed accurately reflected Stape's proper residual functional capacity, the ALJ's determination that Stape could perform jobs that exist in a significant number in the national economy is supported by substantial evidence.

## Conclusion

A review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is affirmed.

An appropriate Order will be entered.

BY THE COURT:


s/Matthew W. Brann
Matthew W. Brann
United States District Judge



Dated: April 14, 2014